IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ENGINEERED ABRASIVES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 18 C 6562 |
| ) | |
| EDWARD C. RICHERME, EDWARD ) | |
| RICHERME, and KAREN RICHERME, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Engineered Abrasives, Inc. (EA) has sued Edward C. Richerme, Edward Richerme, and Karen Richerme for violations of the Lanham Act, unfair competition, deceptive business practices, breach of contract, and unjust enrichment. EA alleges that it is contractually entitled to certain common law trademarks pursuant to a settlement agreement with the defendants and that the defendants breached the agreement by using these marks. EA has moved for partial summary judgment on its breach of contract claim.

## Background

EA is an Illinois company that designs and manufactures automated shot peening and blast finishing equipment. It also makes replacement parts for these machines. In 2011, EA employees Edward Richerme (Ed), his wife Karen Richerme, and their son Edward C. Richerme (Eddie) left EA and formed a competing company,

American Machine Products & Service, Inc. (AMPS).[1] Since then, EA has initiated a number of lawsuits against the defendants.

In February 2012, EA sued Ed and Eddie in state court, alleging that they improperly used EA's trade secrets while selling service and repair parts for EA's shot peening machines. In October and December of that year, the state court entered two preliminary injunctions that restrained AMPS, Ed, and Eddie from, among other things, using EA part numbers and contacting its customers. *See Engineered Abrasives, Inc. v. Am. Mach. Prods. & Serv., Inc.*, No. 13 C 7342, 2015 WL 1281460, at *4 (N.D. Ill. Mar. 18, 2015) (later federal court case describing the 2012 state court case).

In October 2013, while the state action was still pending, EA filed a parallel action against AMPS in federal court for the improper use of EA's copyrighted and trademarked materials. In March 2015, the federal court entered a default judgment against AMPS, awarding EA $719,814.04 and permanently enjoining AMPS from using certain EA trademarks. *See Engineered Abrasives*, 2015 WL 1281460, at *15. That same month, the state court entered an order directing AMPS, Ed, and Eddie to return any materials in their possession that belonged to EA. Pl.'s Ex. 8.

In May 2015, AMPS filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Northern District of Illinois. In September 2015, the bankruptcy court converted the bankruptcy to a Chapter 7 proceeding and appointed a trustee. Pl.'s Ex. 11 at 2, 9.

In August 2015, a few months after EA obtained the default judgment against AMPS, it sued AMPS in federal court again. *See Engineered Abrasives, Inc. v. Am. Mach. Prods. & Serv., Inc.*, No. 13 C 7342, 2016 WL 10612597, at *1 (N.D. Ill. Oct. 17,

---

[1] The Court will refer to the individual defendants by their first names to avoid confusion.

2016) (referencing the second federal lawsuit, *Engineered Abrasives, Inc. v. Am. Mach. Prods. & Serv., Inc.*, No. 15 C 6983 (N.D. Ill. filed Aug. 10, 2015)). In this case, EA alleged, among other things, that in July 2015, AMPS made false and misleading statements about EA in violation of the Lanham Act.

In June 2016, a judge of this court presided over a settlement conference that resulted in a settlement agreement to resolve the claims arising out of the August 2015 lawsuit. The settlement agreement included a "terms of injunction" clause that, among other things, prohibited the Richermes from making false and misleading statements about EA. Pl.'s Ex. 13 (Settlement Agreement) at 2. The agreement also required the defendants to make a $75,000 payment to EA, which the insurer for AMPS paid. *Id.* It also included a liquidated damages clause under which the Richermes agreed to pay EA $250,000 for any breach of the permanent injunction. *Id.* Finally, the parties agreed to a "mutual release clause." *Id.* The barrage of litigation activity that followed the parties' settlement revealed that they vehemently disagree over the scope and extent of this term of the settlement agreement.

Shortly after the parties settled, the Richermes, relying on the settlement agreement's mutual release clause, moved to dismiss EA's pending state action against AMPS in Will County and asked the federal court to vacate the March 2015 default judgment against AMPS. EA argued, however, that the mutual release clause did not require it to release any claims against the defendants other than the August 2015 claims. The Richermes contended that the clause required EA to release any and all claims it had against the defendants arising out of disputes predating the settlement agreement. The federal district court and the state court each ruled against EA. Both

3

courts concluded that the settlement agreement's mutual release clause unambiguously requires EA to release all claims predating the settlement—including the default judgment it had obtained against AMPS.

Meanwhile, AMPS's bankruptcy proceeding resulted in a bankruptcy sale. On August 25, 2016, the bankruptcy court issued a sale order whereby EA purchased certain AMPS assets. The bill of sale listed the following purchased assets:

> books and records, parts numbers and product numbers; inventories; tools, machines, and equipment listed on the Debtor's Schedule B . . . filed in the Bankruptcy Case (but only to the extent still in Seller's possession); materials and supplies; computers and computer software; all domain names (including without limitation ampsabrasives.com and all related registrar information, passwords, login and registration information for such domain); and all records pertaining to the foregoing (all property and assets above referred to herein collectively as the 'Purchased Assets').

Pl.'s Ex. 14 (Bill of Sale) at 12.

Despite unfavorable rulings from the federal district court and the Will County circuit court, EA continued to challenge the scope of the release clause. In 2017, EA appealed both the federal district court and state circuit court rulings on the mutual release clause—but to no avail. In February 2018, the Seventh Circuit affirmed the district court's ruling. *Engineered Abrasives*, *Inc. v. Am. Mach. Prods. & Serv., Inc.*, 882 F.3d 650 (7th Cir. 2018). The Seventh Circuit held that the mutual release clause unambiguously required EA to release all claims it had against the defendants arising out of pre-settlement conduct—including the default judgment. In June 2018, the Illinois appellate court came to the same conclusion as the Seventh Circuit and affirmed the state circuit court judgment. The Illinois Supreme Court denied EA's petition for leave to appeal.

In September 2018, EA filed the present lawsuit against the Richermes, alleging

4

trademark infringement, unfair competition, breach of contract, and unjust enrichment. EA alleges that from at least August 2016 through September 2018, the defendants sold parts using the AMPS name and website address after these assets had become EA's property. EA contends that this conduct violated the settlement agreement's provision that bars the Richermes from making false and misleading statements about EA, its products, and services.

Between August 2016 and September 2018, Eddie Richerme worked as a sales representative for Forecast, a competitor of EA. EA alleges that the defendants improperly accepted and filled orders by creating invoices, purchase orders, and packing slips that bore AMPS's business name and website address in connection with the sale of Forecast products. EA contends that Eddie also used an AMPS part list that included EA part numbers that the Richermes were obligated to return to EA under the March 2015 injunction.

EA has moved for partial summary judgment on its breach of contract claim. EA alleges that the Richermes breached the settlement agreement because they made false and misleading statements about EA. EA argues that the breach entitles it to $250,000 in liquidated damages. EA also contends that the Court should declare its release of the Richermes null and void because they breached the settlement agreement.

## Discussion

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Richardson v. Chi. Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019). In

considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences "in favor of the party against whom the motion under consideration was filed." *Id.* The party opposing summary judgment must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

In count 3 of the complaint, EA alleges that it is entitled to $250,000 in liquidated damages because the Richermes breached the June 2016 settlement agreement. Specifically, EA contends that the defendants improperly sold parts using the AMPS name and domain name after these assets had become EA's property through the AMPS bankruptcy sale in August 2016. EA claims that by using the AMPS trade names and common law trademarks, the defendants made false and misleading statements about EA in violation of the settlement agreement.

**A.     Breach of contract**

Settlement agreements are "enforced just like any other contract" under Illinois law. *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 489 (7th Cir. 2002). A plaintiff suing for breach of contract must prove: the contract existed; the plaintiff performed all contractual obligations; the defendant breached the contract; and damages. *See Smart Oil, LLC v. DW Mazel, LLC*, No. 19-2542, ---F.3d---, 2020 WL 4745068, at *3 (7th Cir. Aug. 17, 2020).

The parties do not dispute that a contract exists. But they disagree over whether EA fulfilled its contractual obligations under the settlement agreement. EA asserts that it did. The Richermes, however, argue that EA has outstanding obligations under the

settlement agreement's mutual release clause, which requires EA to release all claims against the defendants arising or occurring prior to the settlement. The Richermes contend that EA has failed to release several claims against them and that this is a bar against recovery for breach of contract. EA argues that its only obligation under the settlement agreement was to release the August 2015 lawsuit underlying the settlement agreement, which it has already released.

### 1. The mutual release clause

Illinois law bars a party's enforcement action "unless the would-be enforcer has first satisfied his obligations under the agreement." *See Reserve Hotels PTY Ltd. v. Mavrakis*, 790 F.3d 738, 741 (7th Cir. 2015) (citing *W.E. Erickson Constr., Inc., v. Congress-Kenilworth Corp.*, 115 Ill. 2d 119, 126-27, 503 N.E.2d 233, 236-37 (1986)). The settlement agreement includes a mutual release clause, which requires EA and the Richermes to mutually release each other from any and all claims arising or occurring prior to the settlement agreement. In relevant part, section 8.a of the settlement agreement states:

> EA, on behalf of itself, its parents, subsidiaries, affiliates, officers, directors, employees, agents, successors and assigns, hereby releases Defendants, their subsidiaries, affiliates, officers, directors, employees, agents, attorneys, shareholders, successors and assigns, of and from any and all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or, causes of action of every nature, character and description, whether known or unknown, suspected or unsuspected, which it ever had, now has, or may hereafter claim to have by reason of any matter, cause or circumstance whatsoever arising or occurring prior to and including the date of the Agreement, including but not limited to the claims and defenses set forth in the Action.

Settlement Agreement at 3.

EA argues that there is no dispute of fact regarding its fulfillment of its obligations

under the settlement agreement. Specifically, EA argues that it "dismissed the underlying lawsuit—the only suit that EA intended to dismiss by entering into the agreement." Pl.'s Reply Br. at 2. It contends that the settlement agreement "does not identify any additional specific steps that EA was required to take, such as dismissing other lawsuits or vacating judgments" and that it "never intended to release any of these actions." Id. at 2-3. In EA's view, its only obligation under the mutual release clause was to release the claims arising out of the lawsuit it filed against the defendants in federal court in August 2015.

EA is wrong. The Seventh Circuit and the Illinois Appellate Court were clear in their 2018 rulings against EA: the mutual release clause in the parties' settlement agreement unambiguously obligates EA to release all claims against the defendants arising or occurring prior to the agreement. EA's argument is thwarted by these decisions.

The defendants have produced evidence showing that EA filed a lawsuit against the Richermes in state court (in Will County) as recently as April 25, 2017. Review of EA's complaint reveals that it includes claims that arise out of conduct predating the settlement agreement. Defs.' Ex. 3 at 1-6.[2] Thus under the Seventh Circuit and state appellate court's decisions, EA is required to dismiss this suit as well—as least to the extent it covers pre-settlement agreement conduct. The Richermes contend that EA has not done so. In its reply brief, EA repeats that it fulfilled its obligations under the

---

[2] EA implicitly concedes that the claims in its April 2017 lawsuit are based at least partly on conduct predating the settlement agreement. Pl.'s Resp. to Defs.' Stmt. of Facts ¶ 2. ("the 2017 Will County case was not based solely on alleged conduct that occurred before the Settlement Agreement").

8

settlement agreement, but it points to no evidence that it has dismissed the 2017 state court suit (or at least the claims in it that are premised on pre-settlement agreement conduct), such as a notice of dismissal, court order, or copy of the docket.

For these reasons, EA has not removed the question of whether it fulfilled its contractual obligations from the realm of disputed issues.[3] This makes summary judgment in EA's favor inappropriate.

### 2. The terms of injunction clause

In count 3, EA also contends that the Richermes breached the "terms of injunction" clause in the settlement agreement by making false and misleading statements about EA. In relevant part, section 1.1 of the settlement agreement states: "[t]he Parties agree to the entry of a permanent injunction prohibiting each and every Defendant from making false and misleading statements about EA, its products or services, or its officers or owner." Settlement Agreement at 2. EA contends that it purchased all of AMPS's assets in the August 2016 bankruptcy sale and that, as a result, AMPS's common law trademarks and goodwill automatically passed to EA. Because these assets passed to EA, it contends, Eddie Richerme's use of the AMPS name and website address amounted to false and misleading statements about EA and its products and services. Accordingly, EA argues that Eddie violated the settlement agreement's terms of injunction clause when he used EA's property (the AMPS name and domain name) for his own commercial purposes. EA principally relies

---

[3] The Richermes also argue that EA failed to release several other federal and state claims, but EA has established otherwise. Pl.'s Exs. 7-10. The Richermes also allege that EA filed another lawsuit against them in state court in 2018 seeking relief for conduct predating the settlement agreement, but they produced no evidence of the existence of such a case. Defs'. Resp. to Pl.'s Stmt. of Facts ¶ 36.

on the Seventh Circuit's decision in *U.S. Ozone Co. v. U.S. Ozone Co. of America*, 62 F.2d 881 (7th Cir. 1932), to support its claim that it acquired EA's trademarks and trade names when it bought AMPS's assets in the 2016 bankruptcy sale. In *U.S. Ozone Co.*, the court explained that trademarks, trade names, and business goodwill, "in connection with the business to which they relate," are "property in the hands of their owner." *Id.* at 885-86. When such property is owned by a bankrupt, the trademarks and trade names pass with the goodwill of the bankrupt's business. *Id.* Even if these intangible rights are not specifically mentioned in the sale, they nevertheless pass to the purchaser "in connection with the sale of the business" when the business is "sold intact by the trustee." *Id.* EA also cites *Matter of Prince*, 85 F.3d 314 (7th Cir. 1996), for the proposition that AMPS's goodwill was included in the assets EA purchased in the August 2016 bankruptcy sale. *Id.* at 322-23 (holding that an orthodontist's "goodwill, like the practice's physical equipment, can be sold and transferred" in a bankruptcy sale).

The Seventh Circuit cases are consistent with Illinois law. Under Illinois law, trade names, trademarks, and goodwill to transfer to a buyer when the entire business is sold. *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 109, 566 N.E.2d 1004, 1013 (1984) ("The transfer of the property and effect of a business carries with it the exclusive right to use such trademarks or trade name as have been used in such business."); *Smith v. Burkitt*, 342 Ill. App. 3d 365, 370, 795 N.E.2d, 385, 389-90 (2003) ("even though goodwill was not specifically listed as an asset transferred in the agreement, goodwill is generally transferred as an incident to the sale of a business.").

But EA's argument is unavailing. Contrary to EA's contentions, it only purchased

specific AMPS assets; it did not acquire the entire business in the 2016 bankruptcy sale. Defs.' Resp. Br. at 3 ("[t]he AMPS' assets purchased by EA were set forth on an Asset Purchase Agreement"). The evidence shows that AMPS's business was not "sold intact" by the trustee. *See U.S. Ozone Co.*, 62 F.2d at 886; ("When owned by a bankrupt … trade-marks and trade-names pass with the good will of the bankrupt's business to the trustee..."); *see Prince*, 85 F.3d at 324 (holding that the sale of an orthodontics practice, which was a wholly owned professional corporation, included goodwill); *see also Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*, 871 F.2d 697, 700-01 (7th Cir. 1989) ("Absent contrary evidence, a business trade name is presumed to pass to its buyer.").

Neither *U.S. Ozone Co.* nor *Matter of Prince* controls this case. In those cases, the Seventh Circuit explained how trademarks, trade names, and goodwill pass to the buyer in the bankruptcy sale of an entire business. In this case, by contrast, EA purchased specific AMPS assets in the bankruptcy sale. The asset purchase agreement and the bill of sale expressly identified the assets EA bought from the trustee, and the bankruptcy court expressly approved the asset purchase agreement in its sale order. Pl.'s Ex. 14 at 6, 12. In relevant part, the asset purchase agreement states:

> all books and records, parts numbers and product numbers; inventories; tools, machines, and equipment listed on the Debtor's Schedule B . . . (but only to the extent still in Seller's actual possession); materials and supplies; computers and computer software; all domain names (including without limitation ampsabrasives.com and all related registrar information, passwords, login and registration information for such domain (the "AMPS Domain Information")); and all records pertaining to the foregoing (collectively, the "Purchased Assets")[.]

Asset Purchase Agreement at 6. The bill of sale similarly identified the assets sold as

11

follows:

> books and records, parts numbers and product numbers; inventories; tools, machines, and equipment listed on the Debtor's Schedule B . . . filed in the Bankruptcy Case (but only to the extent still in Seller's possession); materials and supplies; computers and computer software; all domain names (including without limitation ampsabrasives.com and all related registrar information, passwords, login and registration information for such domain); and all records pertaining to the foregoing (all property and assets above referred to herein collectively as the "Purchased Assets").

Bill of Sale at 12. Neither the asset purchase agreement nor the bill of sale stated that EA was acquiring all of AMPS's assets, and they made no reference to AMPS's trademarks, trade name, or goodwill. Based on this evidence, there is no basis for a finding that EA acquired AMPS's trademarks, trade names, or goodwill as incidental to the bankruptcy sale.

EA's argument also conflates AMPS's domain name, an asset EA purchased in the bankruptcy sale, with AMPS's website and web address, which are distinct assets that neither the asset purchase agreement nor the bill of sale referenced. *See, e.g.*, Pl.'s Resp. to Defs.' Stmt. of Facts ¶ 7 ("After entry of the Asset Purchase Agreement, EA acquired control over the 'www.ampsabrasives.com' website and used the 'www.ampsabrasives.com' website to redirect consumers to EA's website."). Contrary to EA's contentions, a domain name is distinct from a website or web address: a domain name "identifies a place on the Internet where a home page or web site can be located." *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1036 n.3 (N.D. Ill. 2001) (internal quotations omitted); *see also* 5 McCarthy on Trademarks and Unfair Competition § 25A:10 (5th ed. 2019). The defendants are therefore correct: EA has produced no evidence showing that it acquired AMPS's website or website address.

EA further contends that the bankruptcy trustee's representations to the

bankruptcy court establish that it purchased AMPS's remaining business assets as a whole. The Court disagrees. The trustee's motion made no reference to trademarks, trade names, or other intangible rights. The statement in the motion that the "Purchased Assets represent [AMPS's] only remaining assets" is not, by itself, sufficient to establish that, contrary to the language in the bill of sale, the trustee was authorized to sell, or was selling, AMPS's common law trademarks or trade names as part of the bankruptcy estate sale. *In re Berry Pub. Servs., Inc.*, 231 B.R. 676, 680 (Bankr. N.D. Ill. 1999) (the trustee could only "sell whatever interest the estate had in the assets listed" and is only "permitted to sell assets out of the ordinary course with court approval"). The trustee's "authority to sell [is] limited to the terms of the Sale Order." *See id.* In this case, the "trustee's motion and the bankruptcy court's order made no mention of this sort of intangible right and gave no indication that the trustee was seeking to sell, or the court was authorizing the sale, of every right or asset" that the bankrupt owned. *See Bryant v. Gordon*, 483 F. Supp. 2d 605, 612 (N.D. Ill. 2007) (Kennelly, J.). Rather, "the [trustee's] motion and [sale] order referred only to particular categories of assets." *See id.*; *see also Berry Pub. Servs.*, 231 B.R. at 680 (the "Bill of Sale and the Sale Order limited their terms to the estate's interest in those assets … [i]t is only those interests—the estate's interests, whatever those may have been—that were sold"). In short, the evidence before the Court does not establish that EA purchased all of AMPS's assets in the bankruptcy sale. Finally, AMPS's amended bankruptcy schedule states that it has no patent, copyright, or other intellectual property rights. Defs.' Ex. 4 at 3. If no intangible rights exist, then EA could not have acquired them. *See ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 939 (7th Cir. 2003) (Ripple, J., concurring)

("[bankrupt]'s statement on its bankruptcy schedule [said] that it had no copyright or other intangible property rights").

Because EA has not established that it owns AMPS's trademarks, trade name, and goodwill, and because this is an essential element of its breach of contract claim, EA is not entitled to summary judgment on that claim.[4]

### Conclusion

For the foregoing reasons, the Court denies the plaintiff's motion for partial summary judgment [dkt. no. 107]. The case is set for a telephone status hearing on September 15, 2020 at 8:40 a.m. for the purpose of setting a schedule for further proceedings. The following call-in number will be used: 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 8, 2020

---

[4] The Court also notes that EA has cited no authority for its contention that Ed, Karen, and Eddie are liable for Eddie's conduct as a sales representative for Forecast. And it has produced no evidence establishing that Ed and Karen acted in concert with Eddie. Thus EA would not be entitled to summary judgment against Ed or Karen even if it were entitled to summary judgment against Eddie.